

# NUMBER 13-23-00509-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

THE STATE OF TEXAS,                                               **Appellant,**

**v.**

AMANDA MCDONALD,                                               **Appellee.**

## ON APPEAL FROM THE 144TH DISTRICT COURT
## OF BEXAR COUNTY, TEXAS

## OPINION

### Before Chief Justice Contreras and Justices Benavides and Silva
### Opinion by Chief Justice Contreras

Appellant the State of Texas challenges the trial court's judgment granting appellee Amanda McDonald's motion to suppress. The State argues that the trial court erred when it found that officers violated McDonald's Sixth Amendment right to counsel when they interrogated her in 2018 about charges stemming from a fatal 2007 car accident. Because

the facts of this case align with the unique facts of *State v. Frye*,[1] we hold that McDonald's Sixth Amendment right to counsel, which was asserted and attached to the charges in 2007, was still attached when the officers interrogated her in 2018. Accordingly, we affirm.

## I.   BACKGROUND[2]

On September 4, 2007, the State filed a complaint against McDonald alleging one count of failure to stop and render aid in a collision resulting in death and one count of intoxication manslaughter. *See* TEX. TRANSP. CODE ANN. § 550.021(c)(1)(A); TEX. PENAL CODE ANN. § 49.08(a). On May 14, 2008, each charge was "no-billed" by two separate grand juries. Twelve years later, on May 27, 2020, the State indicted McDonald on one count of failure to stop and render aid and one count of manslaughter arising out of the same incident in 2007. *See* TEX. TRANSP. CODE ANN. § 550.021(c)(1)(A); TEX. PENAL CODE ANN. § 19.04(a). Defense counsel filed a motion to suppress alleging that law enforcement violated McDonald's Fifth Amendment privilege against self-incrimination, Sixth Amendment right to counsel, and due process rights under the Fourteenth Amendment. *See* U.S. CONST. amends. V, VI, XIV.

Lieutenant Brian Sullivan, an officer with the San Antonio Police Department (SAPD) and the lead detective in McDonald's case in 2007, testified at the suppression hearing. Sullivan said that McDonald's case "stuck" with him throughout the years because the case did not result in a conviction, and McDonald was his prime suspect. On August 19, 2018, approximately ten years after her charges were no-billed, he visited

---

[1] 897 S.W.2d 324 (Tex. Crim. App. 1995).

[2] This appeal was transferred from the Fourth Court of Appeals in San Antonio pursuant to an order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001(a). We follow the precedent of the transferor court to the extent it differs from our own. TEX. R. APP. P. 41.3.

McDonald's home to talk to her about her involvement in the 2007 car accident. Sullivan testified that no one at the prosecutor's office or SAPD asked him to resume investigating McDonald's case. Detective Jeremy Goodwin, who accompanied him, was the only person who knew he was questioning McDonald that day.

Sullivan said that the officers knocked on the door and McDonald's father let them inside. He said the officers engaged in conversation with McDonald and admitted that "one of the first things that [they] told her was that she wasn't in trouble." He said his intent was "to talk to [McDonald] to see if she was willing to talk to [him]":

[Counsel]: So when you told her she wasn't in any trouble, you were lying?

[Sullivan]: No. She was not in any trouble at that point.

[Counsel]: But it was your intent that she get in some trouble. Right?

[Sullivan]: I intended to talk to her to see if she was willing to talk to me.

[Counsel]: Your intention was to come up with evidence to forward a case to the D.A.[']s office so that she be prosecuted. That was your intent there.

[Sullivan]: If she would talk to me.

[Counsel]: And so you told her she wasn't in any trouble so she would talk to you?

. . . .

[Sullivan]: To get her to talk to me, yes.

Sullivan said he did not read McDonald her *Miranda*[3] rights at any point because "she was not under arrest." Sullivan testified that neither McDonald nor her father asked the officers to leave at any point during their visit, nor did they instruct the officers to speak

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

to McDonald's lawyer. He said he knew McDonald had representation for the charges in 2007, but he did not know if McDonald had an attorney at the time the officers questioned her in 2018. On cross, defense counsel asked Sullivan:

[Counsel]: [D]o you remember telling her you stopped talking to me?

[Sullivan]: Yes.

[Counsel]: Okay. And she said she couldn't. Right?

[Sullivan]: Yes.

. . . .

[Counsel]: You asked her why. Right?

[Sullivan]: Like I said, I don't remember my words, but I will say yes.

[Counsel]: Okay. And she said my lawyer. Right?

. . . .

[Sullivan]: I guess that's a yes. If that's what the words are.

. . . .

[Counsel]: And then you said, ["]You still could have talked all you wanted, so I am just trying to go back to that point where you were talking to me.["]

[Sullivan]: Right.

[Counsel]: Do you remember saying that?

[Sullivan]: I don't remember, but I will acknowledge that I did say that. Yes.

[Counsel]: So in effect, did you say, I am just trying to get around this whole attorney-client nonsense. Right?

[Sullivan]: I was referring to . . . the interrogation at the time of the custodial arrest in 2007. That's what I was referring to just to that point.

4

Goodwin was wearing a body camera during the officers' visit and the footage was admitted into evidence.[4] The trial court, after viewing the footage, found the following:

a.  One of the first things [Goodwin] told [McDonald] when they entered her home was that she was not in trouble. "Oh, you're not in trouble." The officers said that they just wanted to talk to her.

. . . .

e.  [McDonald] was visibly upset that the officers were there to question her about the accident that occurred in 2007.

f.  [McDonald] believed and expressed several times aloud that the officers were "trying to put the 2007 case back" on her.

g.  [Sullivan] was asking [McDonald] questions about the car accident on September 4, 2007.

h.  At one point [McDonald] raised her voice and said "I don't wanna . . . [.]"

i.  [Sullivan] asked [McDonald] at least three times to "tell him about this other vehicle. . . ."

j.  At one point [Sullivan] said that he tried to talk to her and she said "I couldn't! My lawyer!" [Sullivan] then says that he is just trying to get back to that point when she was talking to him.

k.  The father then mentions the names of her lawyers, and [McDonald] reiterates who her lawyers were at that time: "Joseph Appelt and Mark Haby."

l.  Approximately 20 minutes and 27 seconds into the video, [McDonald] states, "I don't have to talk to you," and she walks away. She can be heard shouting from the hallway, ". . . not without my lawyer!"

m.  [McDonald] then walks into the back yard to smoke a cigarette.

n.  She then opens the back door and tells [Goodwin] that he can come outside and talk to her, but not [Sullivan].

---

[4] The body camera footage confirms that Sullivan made the statements that defense counsel attributed to him in the above colloquy.

o.  [Goodwin] told her that this was "not his case," and that this was his "first day of working."

p.  [McDonald] then began talking to [Goodwin] about what she remembered about the night of the accident.

(Ellipses in original).

The footage includes the entire conversation between Goodwin and McDonald in the back yard. It shows Goodwin asking McDonald how much she had to drink that night. At one point, Goodwin states: "To be honest with you, I can't do anything about the alcohol in your system, okay? We're talking about . . . years and years later. Right now, it's just a general question, talking to somebody." And then later, when McDonald described how many alcoholic drinks she had before driving to one of the bars that night, Goodwin responded: "If you were drunk when you drove over there, right now, I can't do anything about that. Either way that's irregardless [sic] to me. What I'm talking to you about is completely different. I don't care if you drove drunk."

Jospeh Appelt, McDonald's attorney for the 2007 charges, testified at the suppression hearing. Appelt stated that while he is not McDonald's attorney in the present case, the attorney-client relationship between him and McDonald for the 2007 charges was still intact when she was interrogated by the officers in 2018. He further testified that after her charges were no-billed in 2008, he informed McDonald that the charges could be refiled because there is no statute of limitations on these particular crimes.

The trial court granted McDonald's motion to suppress and issued written findings of fact and conclusions of law. Pertinent here, it found:

a.  [McDonald] had retained counsel on charges stemming from the accident in 2007;

b.  [Sullivan] knew [McDonald] had retained counsel on those charges;

6

c.   The attorney-client relationship between [McDonald] and Joseph Appelt related to this case had not terminated;

d.   Both [McDonald] and Joseph Appelt knew that his representation of her related to these charges had not terminated;

e.   The interview by police ten years later was regarding the same case and the same charges;

[f.]  Although [McDonald] was not in custody, [Sullivan] stated that he was "trying to go back to that point" where [McDonald] was under custodial interrogation in 2007;

[g.]  [Sullivan] admitted that [McDonald] was his "prime suspect" on the charges in 2007 and 2008 and again in 2018; and

[h.]  [Sullivan] admitted that his purpose in telling her in 2018 that she was not "in trouble" was to get her to "talk to him" and provide him with incriminating information.

(Citation omitted). It also found that "[e]ven though formal charges were not pending against [McDonald] in 2018, it was clear from [Sullivan's] testimony that his investigation of this case was ongoing," and the officers initiated the interrogation in 2018 for "the purpose of acquiring enough incriminating information so that they could *re*-charge [McDonald] for the same [2007] offenses."

The trial court concluded that McDonald "could not waive her Sixth Amendment right to counsel without the involvement of Joseph Appelt" because (1) McDonald was represented by Appelt when Sullivan and Goodwin interrogated her in 2018, and (2) the officers knew McDonald was represented by counsel when they interrogated her. Accordingly, it found McDonald's Sixth Amendment right to counsel was violated and it granted her motion to suppress.

This appeal followed. *See* TEX. CODE CRIM. PROC. ANN. art. 44.01(a)(5).

7

## II. SIXTH AMENDMENT RIGHT TO COUNSEL

By its sole issue, the State argues that the trial court erred when it granted McDonald's motion to suppress because McDonald did not enjoy a Sixth Amendment right to counsel when the officers interrogated her in 2018.

### A. Standard of Review & Applicable Law

"We review a trial court's ruling on a motion to suppress under a bifurcated standard." *State v. Arellano*, 600 S.W.3d 53, 57 (Tex. Crim. App. 2020) (citing *Weems v. State*, 493 S.W.3d 574, 577 (Tex. Crim. App. 2016)). "We afford almost total deference to a trial court's findings of historical fact and determinations of mixed questions of law and fact that turn on credibility and demeanor if they are reasonably supported by the record." *Id*. (citing *Sims v. State*, 569 S.W.3d 634, 640 (Tex. Crim. App. 2019)). We review de novo the trial court's determination of legal questions and its application of the law to facts that do not turn upon a determination of witness credibility and demeanor. *Id.* The trial court's ruling will be sustained if it is correct on any applicable legal theory and the record reasonably supports it. *State v. Ruiz*, 581 S.W.3d 782, 785 (Tex. Crim. App. 2019).

"The Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of criminal proceedings." *Missouri v. Frye*, 566 U.S. 134, 140 (2012) (quoting *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009)) (cleaned up). Interrogation by the State is a critical stage of criminal proceedings. *Montejo*, 556 U.S. at 786. "The Sixth Amendment right to counsel does not apply until it has attached, and it attaches when the prosecution has commenced." *Rubalcado v. State*, 424 S.W.3d 560, 570 (Tex. Crim. App. 2014). "The prosecution commences for Sixth Amendment right-to-counsel purposes 'at the first appearance before a judicial officer at which the defendant is told of the formal

accusation against him and restrictions are imposed on his liberty.'" *Id.* (quoting *Rothgery v. Gillespie County*, 554 U.S. 191, 198 (2008)). After the Sixth Amendment right is asserted and attached, "[t]he State is then obligated to not act in a manner that circumvents the protections accorded the accused by invoking his right." *Wesbrook v. State*, 29 S.W.3d 103, 117 (Tex. Crim. App. 2000) (citing *Maine v. Moulton*, 474 U.S. 159, 106 (1985)).

The Sixth Amendment is "offense specific." *Texas v. Cobb*, 532 U.S. 162, 166–68 (2001) (citing *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)); *Rubalcado*, 424 S.W.3d at 570. This means that the right "cannot be invoked once for all future prosecutions," *Cobb*, 532 U.S. at 166–68, and "does not attach to any and every crime that an accused may commit or have committed," *id.* at 177 (Breyer, J., dissenting). It also means the Sixth Amendment does not extend to uncharged "crimes that are 'factually related' to those that have actually been charged." *Id.* at 167–68 (majority opinion). However, the Sixth Amendment can attach to uncharged offenses that would be considered the same offense for double jeopardy purposes. *Id.* at 173 (holding that when the Sixth Amendment right to counsel attaches, it encompasses "offenses that, even if not formally charged, would be considered the same offense" for double jeopardy purposes).

## B.      Analysis

The State does not dispute any of the trial court's findings of fact. The facts that Sullivan knew McDonald was represented by counsel, "McDonald's attorney-client relationship was still intact ten years after the case was initially dropped," and "the subsequent indictment was for the same offense" are immaterial, according to the State's analysis. Instead, it argues that McDonald did not enjoy a Sixth Amendment right to

counsel when the officers interrogated her in 2018 because once her "initial charges were terminated by a grand jury [in 2008] and abandoned by the State for ten years, her Sixth Amendment right to counsel had ceased." It asks this Court to "hold as a general matter that the Sixth Amendment right to counsel ends when charges are terminated."

The State attempts to distinguish this case from *State v. Frye*, 897 S.W.2d 324 (Tex. Crim. App. 1995). In *Frye*, the Texas Court of Criminal Appeals examined whether a defendant retained his Sixth Amendment right to counsel in the months following the dismissal of his charges. *Id.* at 325–26. Frye was charged by complaint with a single misdemeanor offense of theft of services on April 3, 1988, and retained counsel. *Id.* at 325. About five weeks later, on May 16, 1988, the State moved to dismiss the complaint with prejudice. *Id.* The prosecutor noted on the State's motion to dismiss "that the theft charges were being dismissed pursuant to a 'continuing investigation including this transaction.'" *Id.* The trial court granted the motion to dismiss. *Id.*

On August 5, 1988, the District Attorney's Office opened a new file on alleged thefts involving Frye. *Id.* In December 1988, about six months after Frye's initial charge was dismissed, the prosecutor assigned to Frye's case called him. *Id.* The prosecutor, while knowing that Frye had retained an attorney for the misdemeanor charge, recorded the call without Frye's knowledge and elicited "information material to the investigation," including "the theory of the defense" from him.[5] *Id.* at 325–26. The State then indicted

_____

[5] About two months prior, on October 4, 1988, a student intern with the District Attorney's Office had also called Frye and asked him if he would be willing to "explain his side of the story." *Frye*, 897 S.W.2d at 325. Frye heard a "beeping sound" and asked the intern if the phone call was being recorded. *Id.* She told Frye "No" even though she was, indeed, recording their conversation. *Id.* She informed Frye "that she was a student intern with the D.A.'s office and that she had been assigned his file," and she was calling him "to make sure [the D.A.'s office] weren't in the wrong." *Id.* Frye informed her that he had retained a lawyer, "and repeatedly asked if it was necessary that he contact his attorney or if he should terminate the

10

Frye with felony theft of services by aggregating the original allegations with additional offenses. *Id.* at 326. Frye's attorney, upon learning of the recorded phone conversations, moved to dismiss the indictment "on the grounds that the conversations deprived [Frye] of his [Sixth Amendment] right to counsel." *Id.* The trial court granted his request "[b]ased upon the 'prosecutorial misconduct' of the D.A.'s office," and "dismissed the indictment with prejudice." *Id.*

The court of appeals affirmed. *Id.* at 327. The court found that Frye's "Sixth Amendment right to counsel had attached to the misdemeanor charge[] and that [Frye] invoked the right by retaining an attorney." *Id.* It concluded that even though there were no charges pending against Frye after the misdemeanor complaint was dismissed, Frye's Sixth Amendment right to counsel was uninterrupted between charges because "the misdemeanor complaint was dismissed specifically for the purpose of conducting further investigation" involving the same offense and he "was still represented by counsel even after the dismissal of the misdemeanor complaint." *Id.*

The court of criminal appeals agreed. *Id.* 328–30. It found that Frye's Sixth Amendment right to counsel "clearly" attached when the State filed the misdemeanor complaint. *Id.* at 328. It then found "that even though the dismissal of the misdemeanor information and complaint altered the positions of the parties, such dismissal was accomplished specifically for the purpose of conducting a 'continuing investigation including this transaction.'" *Id.* at 329. The Court further noted the "potential for government abuse":

---

conversation." *Id.* The intern "did not respond to [Frye's] comments, other than to say that she was just trying to clear up her files, and that 'it's no big deal.'" *Id.* This conversation also elicited "information material to the investigation." *Id*. at 326.

11

Police could intentionally circumvent Sixth Amendment protections by charging an individual with a predicate crime, for the purpose of conducting interrogation on an aggravated crime. Or as in the instant case, dismiss all charges against an accused, put the "adversarial" process on hold to reinitiate questioning without the presence of counsel, thus giving the State the power to unilaterally sever appellee's constitutional rights and protections. Such conduct is antithetical to the purpose of the Sixth Amendment in preserving the attorney client relationship and assuring effective and complete representation at all critical stages of the criminal process.

*Id.* (citations omitted).

The State contends that this case is different from *Frye* because McDonald's charges were not dismissed for the purpose of conducting a continuing investigation. *See id.* It argues that, because there were no formal "criminal proceedings" pending against her in 2018, McDonald did not have a Sixth Amendment right to counsel when the officers interrogated her.

We are unpersuaded by the State's attempt to distinguish this case from *Frye*. Instead, we conclude that the facts of this case are largely analogous and warrant the same outcome. As in *Frye*, McDonald's Sixth Amendment right to counsel clearly attached to the initial charges in 2007, and she asserted that right when she retained Appelt. *See id.* at 328. As in *Frye*, McDonald had no pending charges against her when the officers interrogated her in 2018.[6] *See id.* But again, as in *Frye*, McDonald was still represented by Appelt after her charges were no-billed, and their attorney-client relationship was still intact, which the officers knew, when they interrogated her in 2018. *See id.* at 328–29.

---

[6] We note that "[a] Grand Jury's no-bill is merely a finding that the specific evidence brought before the particular Grand Jury did not convince them to formally charge the accused with the offense alleged." *Rachal v. State*, 917 S.W.2d 799, 807 (Tex. Crim. App. 1996). It is not the same as a dismissal with prejudice, as was ordered in *Frye*. *See* 897 S.W.2d at 325.

12

We are also unpersuaded by the State's argument that *Frye* is distinguishable because McDonald's charges were not dismissed for a "continuing investigation." The trial court found that "it was clear from [Sullivan's] testimony that his investigation of this case was ongoing." *See id.* at 325. And the court found that the 2018 interrogation was initiated by the officers for "the purpose of acquiring enough incriminating information so that they could *re*-charge [McDonald] for the same offenses she was charged with back in 2007." We see no reason to differentiate between a police officer deciding to re-investigate charges against a defendant from a prosecutor deciding to re-investigate charges against a defendant. *See id.* at 329; *cf. Rubalcado*, 424 S.W.3d at 574 (quoting and agreeing with principle stated in *Michigan v. Jackson*, 475 U.S. 625, 634 (1986) that "Sixth Amendment principles require that we impute the State's knowledge from one state actor to another"). We also find it significant that McDonald's charges have no statute of limitations, which gives the State the potential to continue investigating McDonald indefinitely, unlike the misdemeanor charge in *Frye* which had a two-year limitations period. *See* TEX. CODE CRIM. PROC. ANN. arts. 12.01(1)(A), (F); 12.02(a).

The fact that McDonald was interrogated ten years after her charges were dismissed does not change our analysis. In *Cobb*, the United States Supreme Court re-affirmed its holding that the Sixth Amendment right to counsel is "offense specific," and held that an attached Sixth Amendment right does not extend to uncharged crimes that are merely "'factually related' to those that have actually been charged." 532 U.S. at 167–68. However, the Court clarified that the Sixth Amendment may attach to uncharged offenses that would be considered the same offense for double jeopardy purposes. *Id.* at 173. Neither *Cobb* nor *Frye* suggests that one's Sixth Amendment right to counsel can

13

be time-barred from attaching to the same uncharged offense. *See id.*; *Frye*, 897 S.W.2d at 329–30 (finding that "even though the dismissal of the misdemeanor information and complaint altered the positions of the parties," Frye's "Sixth Amendment right to counsel remained when the telephone conversations at issue occurred" six months later). Thus, we reject the notion that McDonald's Sixth Amendment right may have terminated simply from the passage of time alone.[7]

The State contends that "to the extent that there is any trend in state or federal cases as to whether the Sixth Amendment remains in effect following the termination of adversarial proceedings, that trend favors the ability of law enforcement to [re-]approach a suspect and ask questions." The State cites three federal cases and two state cases which have no binding authority on this Court. However, each of these cases recognize an exception for when the State dismisses the charge against the defendant for the purpose of circumventing the defendant's Sixth Amendment right to counsel. *See United States v. Montgomery*, 262 F.3d 233, 246–47 (4th Cir. 2001) (noting that a defendant's Sixth Amendment rights may be violated if the State dismisses the charge in a way "calculated to deprive an individual of his right to counsel," but finding no such facts to indicate that the State did so in that case); *United States v. Bartelho*, 129 F.3d 663, 675 (1st Cir. 1997) ("Deliberate chicanery by the government intended to subvert an

_____

[7] We also note that our analysis aligns with the United States Supreme Court's holding in *Texas v. Cobb*, 532 U.S. 162 (2001). The charged offense in *Cobb*—for which the defendant had retained counsel—was burglary, and the uncharged offense—for which he was later interrogated without counsel—was capital murder. *Id.* at 165–66, 174. The Court held that the defendant's Sixth Amendment right did not attach to the uncharged capital murder offense because it was a different offense than burglary for double jeopardy purposes. *Id.* at 173–74. In contrast, McDonald's initial charges were the same, for double jeopardy purposes, as the charges filed in 2018. *See Ervin v. State*, 991 S.W.2d 804, 814–17 (Tex. Crim. App. 1999) (concluding that manslaughter and intoxication manslaughter are the same offense for double jeopardy purposes when they involve the same victim); *Cobb*, 532 U.S. at 173 ("We see no constitutional difference between the meaning of the term 'offense' in the contexts of double jeopardy and of the right to counsel.").

14

accused's Sixth Amendment rights, by delaying formal charges, may give rise to a right to counsel before charges are brought."); *United States v. Martinez*, 972 F.2d 1100, 1105–06 (9th Cir. 1992) (holding that "collusion by the prosecutorial authorities to circumvent the right to counsel may cause Sixth Amendment protection to bridge the gap between separate and non-intertwined offenses," and remanding for the trial court to determine whether there was improper collusion between the State and federal authorities); *State ex rel. Sims v. Perry*, 515 S.E.2d 582, 635 (W. Va. 1999) ("[W]e hold that unless a criminal defendant can show that the government has obtained a dismissal of adversarial judicial criminal proceedings against him or her in order to circumvent his or her constitutional rights, once such criminal proceedings have been dismissed, the right to the assistance of counsel granted by the Sixth Amendment . . . no longer applies, regardless of whether the defendant is represented by counsel."); *People v. Riggs*, 568 N.W.2d 101, 116–17 (Mich. App. 1997) (noting other jurisdictions' "concern[s] that the government could abuse the charging process by dismissing charges against a defendant for the purpose of further investigation and thereby circumvent the defendant's right to counsel," but finding no such concern in that case).[8]

Like the Court in *Frye*, the courts in these cases were concerned for the potential of "government abuse" and intentional circumvention of the Sixth Amendment. *See Frye*, 897 S.W.2d at 329; *see also Moulton*, 474 U.S. at 171 ("[A]t the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel."). While the State contends

---

[8] For a relatively comprehensive compilation of case law on this issue, see *Lindsey v. United States*, 911 A.2d 824, 834–38 (D.C. 2006).

that "there is no evidence" in this case "that the State was subverting McDonald's rights by dismissing the initial prosecution," the officers' actions in 2018 were constitutionally suspect, at least. The record shows that Sullivan decided to investigate McDonald without notifying SAPD or the Bexar County District Attorney's office, knew she had representation, admitted he was trying to take McDonald "back to that point" where she did not have representation; and falsely told McDonald that she was "not in trouble" in order to induce her to provide incriminating information. Goodwin also misled McDonald by telling her that there was nothing he could do about whether she was intoxicated the night of the accident. The officers' conduct was "antithetical to the purpose of the Sixth Amendment in preserving the attorney client relationship." *See Frye*, 897 S.W.2d at 329.

In sum, the facts of this case align with the unique facts in *Frye* and warrant the same holding. *See id.* at 329–30. We must defer to the trial court's findings of historical fact and its determination of mixed questions of law and fact that turn on an assessment of a witness's credibility or demeanor so long as they are reasonably supported by the record. *Sims*, 569 S.W.3d at 640. The parties do not dispute the trial court's findings that the officers initiated a noncustodial interrogation with McDonald when they came to her home in 2018; McDonald's Sixth Amendment right to counsel attached to the charges in 2007; her attorney-client relationship for those charges was intact when the officers interrogated her; and the officers were continuing the investigation into McDonald's 2007 charges. We conclude that the officers violated McDonald's Sixth Amendment rights when they interrogated her in 2018 for the purpose of re-charging her for the same 2007

16

offenses.[9] *See id.*; *Frye*, 897 S.W.2d at 329–30.

We do not take lightly the fact that the underlying incident resulted in the tragic death of an individual. However, it is not a fact that can be considered in the analysis of this important constitutional issue. We overrule the State's sole argument.

### III.     CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS
Chief Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
5th day of December, 2024.

---

[9] In its conclusions of law, the trial court concluded: "[A]n accused who is represented by counsel may not waive her Sixth Amendment right to counsel during a police-initiated interrogation without the involvement of her attorney." However, even if counsel is absent, a represented defendant may waive their Sixth Amendment right to counsel "so long as relinquishment of the right is voluntary, knowing, and intelligent . . . . And when a defendant is read his *Miranda* rights . . . and agrees to waive those rights, that typically does the trick." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). The State does not argue that McDonald waived her Sixth Amendment right, and it acknowledged at oral argument that it forfeited the waiver issue on appeal. *See id.* Thus, we do not address waiver in our analysis.

17