

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-1269-16

**CHRISTOPHER JAMES HOLDER, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FIFTH COURT OF APPEALS
### COLLIN COUNTY

**HERVEY, J., delivered the opinion of the Court in which KELLER, P.J., KEASLER, RICHARDSON, NEWELL, and WALKER, JJ., joined. YEARY, J., filed a concurring and dissenting opinion. KEEL, J., concurred. SLAUGHTER, J., dissented.**

### O P I N I O N

The Stored Communications Act (the SCA) is a federal statute through which the State can obtain historical cell site location information (CSLI) showing the location of a cell phone dozens of times a day up to five years in the past. A court can order such records disclosed if the government shows "specific and articulable facts . . . that there are reasonable grounds to believe that the . . . records or other information sought, are

relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d).

Christopher James Holder, Appellant, was charged with capital murder. During the course of the investigation, police accessed 23 days of his CSLI to corroborate his alibi that he was out of town when the victim was killed. But Appellant lied. The records showed that he was near the victim's house at the time of the murder. After he was arrested and charged, Appellant filed two motions to suppress.[1] In one of them, he alleged that the "specific and articulable" statutory standard was not met and that the records should have been suppressed because accessing the CSLI violated Article I, Section 9 of the Texas Constitution.[2] The trial court denied the motion. On direct appeal, the court of appeals affirmed the trial court's rulings. *Holder v. State*, No. 05-15-00818-CR, 2016 WL 4421362 (Tex. App.—Dallas Aug. 19, 2016) (not designated for publication).

On discretionary review, Appellant argues that the court of appeals was wrong on both accounts. We agreed to review his SCA claim, but not his Article I, Section 9 claim. Due to intervening legal developments, however, we retrospectively granted Appellant's Article I, Section 9 claim and ordered briefing from the parties. *Holder v. State*, PD-1269-

---

[1]The second motion was to suppress statements made by Appellant to the police.

[2]That provision states that,

The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation.

TEX. CONST. art. I, § 9.

16, 2019 WL 5445198 (Tex. Crim. App. Oct. 23, 2019) (per curiam) (ordering briefing on

Appellant's Article I, Section 9 issue).

## **FACTUAL BACKGROUND**[3]

In the summer of 2012, Appellant and his girlfriend, Casey James, moved into

Billy Tanner's home with James's two children. Tanner was James's ex-stepfather.[4] By

October, Appellant's and James's relationship soured, and Tanner asked Appellant to

move out. Appellant moved into his tattoo shop in Irving, but James and her daughters

continued to live in Tanner's home. In early November, James spoke to Appellant and

told him that one of her daughters, C.J., told her that Tanner was "nasty" and that he slept

without his underwear. James asked Appellant if he had ever seen Tanner act

inappropriately around C.J., and he said that he had. According to Appellant, he never

said anything to James though because James was in the room when it happened. James

concluded that Tanner had not been inappropriate after she and a friend of hers spoke to

C.J. The next time James spoke to Appellant, she told him that she would be out of town

between November 9 and November 11 and that her kids were going to stay with one of

her friends while she was gone.[5]

---

[3]We address only the facts necessary to dispose of this case. The court of appeals reviewed the facts in detail. *Holder*, 2016 WL 4421362, at *1–8.

[4]James regarded Tanner like a father because he was the only father figure she ever had.

[5]An investigator for Child Protective Services interviewed C.J. a month later and concluded that she was not sexually abused.

When James returned to Tanner's home on November 11 at about 8:00 p.m., she thought that something was wrong. The garage-door opener did not work, and Tanner's truck was not at the house, which was surprising because he was normally home at 8:00 p.m. on a Sunday. She entered the house through a sliding glass door in the back, and when she walked in, it was pitch black, which was unusual, and there was a horrible smell. She also noticed that someone had hung a blanket over the sliding glass door that had partially fallen and that there was "liquid running down the hallway." Investigators later discovered that someone had tried to burn the house down.[6] James was afraid and went back to her vehicle where her two children were sleeping. She called her mother, who told her to call the police. James called the police, and they responded to the possible burglary.

Police found Tanner's body in the house. According to one officer, it looked like the body had "been there awhile . . . ." He had suffered blunt-force trauma to the head and was stabbed twenty times. A stab wound to Tanner's neck was inflicted post-mortem, and Tanner had defensive-type wounds on his hands. There was blood all over his body and around it. Police concluded that the murder was a crime of passion, not a burglary gone wrong, even though Tanner's wallet had been stolen.[7] They also found two black latex

---

[6]When police first entered the house, they smelled the strong odor of gasoline and oil. Just inside the entrance to the master bedroom, they found a pile of partially burnt clothes.

[7]Although Tanner's wallet was missing, other valuable items were still in the house, like Tanner's rifles, which were hanging in the living room on a gun rack.

gloves on the kitchen table, which James said were not there when she left for the weekend. James had never seen black latex gloves at the house or seen Tanner with black latex gloves. But on Facebook there was a picture of Appellant wearing similar black latex gloves while he was tattooing someone, and DNA testing showed that "it would be extremely unlikely that anyone other than [Appellant] was a major contributor from [the] three glove swabs."

The morning of November 12, police obtained a court order directing AT&T Wireless (AT&T) to disclose call log and CSLI records showing the location of Appellant's cell phone between October 20 and November 12, but an AT&T representative declined to produce them because, according to them, the court order had to be based on probable cause.[8] After changing the phrase "reasonable suspicion" to "probable cause," the petitioning officer took the new order to a judge, who signed it.[9] According to the officer, "[i]t was simpler for [him] to just change the wording[,] have it re-signed[,] and bother the judge one more time . . . ."

The second petition stated that,

Pursuant to the authority of article 18.21, Section 5, Texas Code of

---

[8]An AT&T representative wrote that "[a] Search Warrant or court [o]rder issued 'pursuant to Probable Cause' is required in order to obtain Locator Tool Information. The authority to obtain location information based on 'specific and articulable facts' comes from 18 U.S.C. 2703 which specifically states that it does not apply to tracking devices."

[9]The State conceded at oral arguments that the petition did not set forth sufficient facts to establish probable cause. Oral Arg., *Holder v. State*, PD-1269-16, at 38:54–39:40 (Sept. 27, 2017).

Criminal Procedure, Petitioner hereby makes written application for a Court Order to obtain the below-listed records or information pertaining to a subscriber or customer of the below-listed electronic communication service.

The following records or information are sought:
*Any and all records regarding the identification of a* **AT&T Wireless** *user with the assigned telephone number of: . . . to include subscriber's name, address, date of birth, status of account, account history, call detail records,* **including tower information** *for calls made or received, for the period of October 20, 2012 through November 12, 2012, service address and billing address, ANI, method of payment and information on any and all other numbers assigned to this account or this user in the past or present. Affiant also requests that this order allow for the precision location/GPS location of the cellular handset to be provided for a period of 20 days beginning November 12, 2012.*

\* \* \*

Petitioner has probable cause that the above records or information are relevant to a current, on-going police investigation of the following offense or incident:
### Death Investigation – Texas PC 19.03
The cellular telephone was used by a possible suspect to communicate with unknown persons and obtaining the locations of the handset will allow investigators to identify if this suspect was in the area at the time of the offense and will provide investigators leads in this case.

AT&T then emailed Plano police 23 days of Appellant's call log and historical CSLI records from between October 20 and November 12.

That same day, police interviewed Appellant and asked him where he was the weekend of November 9 and whether he had his cell phone with him. Appellant responded that he was in Irving and that he had his cell phone with him. Police then confronted Appellant with the CSLI showing that he was in Tanner's coverage area

multiple times that weekend, which contradicted his story that he was out of town. Suddenly, Appellant remembered that he was near Tanner's house that weekend, but he was only there to buy drugs and never went to Tanner's house. The police asked Appellant about Tanner and C.J., and Appellant told them that "children shouldn't be molested."

The call log records showed that Tanner was alive until at least 2:35 p.m. on November 10 because that is when he ended a phone call with his parents.[10] The records also showed that, between 3:28 p.m. and 4:16 p.m. the same day, Appellant's cell phone connected to the tower that "best served" Tanner's home. (According to the State, this is when Tanner was killed.) By 4:16 p.m., Appellant's cell phone had left the area, but it reentered the area at 12:41 a.m. on November 11. Appellant's phone was pinging in Tanner's coverage area until 12:44 a.m. From 12:44 a.m. to 2:11 a.m., there was no activity on Appellant's phone. At 2:11 a.m., the phone pinged a tower near the parking garage where police found Tanner's abandoned truck.

In January, a Tarrant County fire investigator told Plano detectives that an inmate named Thomas Uselton (Uselton) had information about the murder. Uselton told the detectives that he had known Appellant for a few years and that Appellant called him on November 10 around 2:00 p.m. or 3:00 p.m. because he wanted to buy drugs. According to Uselton, Appellant sounded "real hysterical, like real hyper." Uselton said that

---

[10]After this call ended, Tanner's phone did not connect to another tower until it was recovered by police.

Appellant called him back later that day and asked him to help with "something" and that he agreed. Appellant rode with his ex-girlfriend to Fort Worth to pick up Uselton.[11] After they picked him up, she drove them to Appellant's tattoo parlor, where Appellant picked up some bleach and black latex gloves, then to Tanner's house. According to Uselton, when they entered Tanner's house, Appellant hugged him and told him that "[h]e's dead. We ain't got to worry about it." Uselton asked who was dead, but then he saw Tanner's body around the corner. Appellant said, "[T]hink about our family, bro. You know what it is if you say anything." Uselton asked what Tanner did, and Appellant responded that "He molested a little girl." Uselton understood Appellant's comment as an admission that he killed Tanner. Uselton said that Appellant's ex-girlfriend picked them up at the parking garage in Irving where police found Tanner's abandoned truck. While Appellant and Uselton waited, Uselton "spray[ed] everything down with bleach." When Appellant's ex-girlfriend arrived, they went back to Appellant's tattoo shop. Uselton went to a nearby convenience store to buy some cigarettes and a drink. When he returned, he overheard Appellant's ex-girlfriend ask Appellant in another room, "Why did you do it?" He replied that he "had to."

Uselton also told police other details about the crime that were not public. For example, he told police that Appellant unplugged the garage-door opener at Tanner's

---

[11]Appellant had known his ex-girlfriend since high school, and they remained involved while Appellant and James dated. She testified that they were mostly just friends but that they were occasionally intimate. Appellant was planning to move in with her at the time of the murder.

house, that he helped Appellant cover up windows and the sliding glass door with blankets, and that he helped Appellant pour gas around the house.

## THE STORED COMMUNICATIONS ACT

We recently decided that suppression is not an available remedy for non-constitutional violations of the Stored Communications Act.[12] *Sims v. State*, 569 S.W.3d 634, 642 (Tex. Crim. App. 2019). Consequently, even if the State did not meet the SCA's "specific and articulable facts" statutory standard, as Appellant claims, the CSLI should not be suppressed on that basis. *Id.* We overrule Appellant's statutory ground for review and turn to his constitutional claim.

## ARTICLE I, SECTION 9

### a. Law

Article I, Section 9 states that "the people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches" and that "no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation." TEX.

---

[12]In his supplemental brief, Appellant asserts that the records should have been suppressed under the SCA and former Article 18.21 because "exclusion under the more specific statute is appropriate for constitutional violations." Appellant's Supp. Brief at 11. Appellant misunderstands our discussion in *Sims*.

We held that Sims could not invoke Article 38.23(a) to remedy a non-constitutional violation of either the SCA or Article 18.21 due to the exclusivity clauses in those statutes. *Sims*, 569 S.W.3d at 642. And while we did mention a specific statutory suppression rule (Article 18.21§ 3(d)), it applied only to the emergency installation and use of pen registers and trap and trace devices, not historical CSLI. Here, Article 38.23(a) can be invoked if the search violated Article I, Section 9 because the exclusivity clauses do not apply to constitutional violations.

CONST. art. I, § 9. It also protects certain expectations of privacy. *Hankston v. State*, 517

S.W.3d 112, 117 (Tex. Crim. App. 2017). A person has an expectation of privacy under

Article I, Section 9 if he has a subjective privacy interest that society recognizes as

objectively reasonable. *Id.*

Article I, Section 9 and the Fourth Amendment are almost identically worded, but

this Court interprets the Texas Constitution by "our own lights."[13] *Olson v. State*, 484

S.W.2d 756, 762 (Tex. Crim. App. 1969). For example, we have held that there is no

implicit warrant requirement in Article I, Section 9.[14] *Hulit*, 982 S.W.3d at 436. When

determining whether to apply Fourth Amendment precedent to Article I, Section 9, we

have often noted the striking similarities between the two provisions and that they protect

---

[13]This phrase is derived from the Debates in the 1875 Texas Constitutional Convention. On September 17, 1875, the Convention debated whether the 1845 Texas Constitution should serve as the basis for the 1876 Texas Constitution. Charles DeMorse spoke against the resolution,

> MR. DEMORSE said that, while everyone admitted the wisdom of the principles of the Constitution of 1845, they were sent, not to reenact that or any other instrument, but to make a Constitution according to their best lights on the subject. He moved the indefinite postponement of the report, which was carried.

DEBATES IN THE TEXAS CONSTITUTIONAL CONVENTION OF 1875 at 45 (Seth Shepard McKay ed. Sept. 17, 1875). This same sentiment was expressed, however, during the debates of the 1845 Texas Constitution Convention. When reconsidering whether to adopt a provision from the recently drafted Louisiana Constitution (1844-1845), Thomas Jefferson Rusk, President of the Convention, said that, "We can reflect for ourselves, and are capable of forming a Constitution for ourselves." WM. F. WEEKS, DEBATES OF THE TEXAS CONVENTION at 468 (Aug. 8, 1845).

[14]We reasoned that the plain language did not support such a requirement and that the Supreme Court's holding "created a jurisprudential mare's nest" because "[t]here are so many exceptions to the warrant requirement that most searches and seizures are conducted without warrants and justified under one of the exceptions." *Hulit*, 982 S.W.3d at 436.

the same right to the same degree, but the touchstone of our analysis is whether the Supreme Court's reasoning makes more sense than the alternatives.[15] *Crittenden v. State*, 899 S.W.2d 668, 673 (Tex. Crim. App. 1995). We faced that situation in *Crittenden*. There, we had to decide the standard to apply to pretextual stops under Article I, Section 9. We discussed three alternatives: the Fourth Amendment objective approach, the subjective approach, and the modified-objective approach. Ultimately, we decided to adopt the Fourth Amendment objective approach because "the objective approach clearly makes more sense" than the alternatives. *Id.*

Recently, when faced with deciding whether a person has a protected privacy interest in his CSLI, we said that it made more sense to apply the Fourth Amendment third-party doctrine to CSLI under Article I, Section 9 than the alternative, which was to

[15]We have applied numerous Supreme Court interpretations of the Fourth Amendment to Article I, Section 9. *Hankston*, 517 S.W.3d at 112–13 (citing *Ford v. State*, 477 S.W.3d 321 (Tex. Crim. App. 2015) (applying the Fourth Amendment expectation-of-privacy and third-party doctrines to Article I, Section 9)); *Richardson v. State*, 865 S.W.2d 944, 948 (Tex. Crim. App. 1993) (citing *Green v. State*, 566 S.W.2d 578 (Tex. Crim. App. 1978)) (applying the Fourth Amendment third-party doctrine and the *Katz* expectation-of-privacy analysis to Article I, Section 9); *Crittenden v. State*, 899 S.W.2d 668, 673 (Tex. Crim. App. 1995) (quoting *Garcia v. State*, 827 S.W.2d 937, 942 (Tex. Crim. App. 1992)).

Although we have occasionally held that Texans have greater privacy rights under the Texas Constitution than the United States Constitution, we have since largely brought that caselaw back into line with the Supreme Court's interpretations of the Fourth Amendment. In *Richardson*, we recognized that Texans had greater privacy rights under Article I, Section 9 when it came to pen registers. *Richardson*, 865 S.W.2d at 951. In *Autran v. State*, 887 S.W.2d 31, 42 (Tex. Crim. App. 1994) (plurality op.), we held that Article I, Section 9 "provides greater protection than the Fourth Amendment in the context of inventories." In *State v. Ibarra*, 953 S.W.2d 242, 243 (Tex. Crim. App. 1997), we held that, unlike the Fourth Amendment, a person's voluntariness of consent must be proven by clear and convincing evidence. We have since declined to follow *Richardson* and *Autran*, and we have limited our holding in *Ibarra*. *Hankston*, 517 S.W.3d at 120.

apply our precedent, holding that a person has greater privacy rights under Article I, Section 9 than the federal Constitution when it comes to pen registers. *Richardson*, 865 S.W.2d at 951. (A pen register captures numbers dialed on a landline telephone.) We decided to apply the third-party doctrine to CSLI because we concluded in *Ford v. State*, 477 S.W.3d 321 (Tex. Crim. App. 2015) that the Supreme Court would apply the doctrine to historical CSLI under the Fourth Amendment. *Hankston*, 517 S.W.3d at 120 ("[I]f we are not going to find that the acquisition of cell phone records is a search under the Fourth Amendment [in *Ford*], then we are not going to find that the acquisition of cell phone records is a search under [Article I, Section 9].") (footnote omitted) (relying on *Ford*, 477 S.W.3d at 321).

### b. Review on Our Own Motion

After we decided in *Hankston* that a person does not have an expectation of privacy in his CSLI because of the third-party doctrine, Hankston successfully petitioned the United States Supreme Court to vacate our judgment. The Court did so in light of its decision in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), in which it held that the Fourth Amendment third-party doctrine does not apply to CSLI.[16] In light of those developments, we retrospectively granted review of Appellant's constitutional claim on our own motion and ordered briefing to clarify whether the third-party doctrine should

---

[16]While the Supreme Court held that a person has an expectation of privacy in at least seven days of historical CSLI, we need not go that far. The issue here is about 23 days of Appellant's CSLI. *Carpenter*, 138 S. Ct. at 2217 n.3.

apply to CSLI under Article I, Section 9.

We begin by reviewing *Carpenter*.

## b. *Carpenter*

### 1. CSLI Background

The Supreme Court began its decision with a discussion of the nature of CSLI records. Because that discussion is critical to our resolution of this case, we quote it in its entirety,

> There are 396 million cell phone service accounts in the United States—for a Nation of 326 million people. Cell phones perform their wide and growing variety of functions by connecting to a set of radio antennas called "cell sites." Although cell sites are usually mounted on a tower, they can also be found on light posts, flagpoles, church steeples, or the sides of buildings. Cell sites typically have several directional antennas that divide the covered area into sectors.
>
> Cell phones continuously scan their environment looking for the best signal, which generally comes from the closest cell site. Most modern devices, such as smartphones, tap into the wireless network several times a minute whenever their signal is on, even if the owner is not using one of the phone's features. Each time the phone connects to a cell site, it generates a time-stamped record known as cell-site location information (CSLI). The precision of this information depends on the size of the geographic area covered by the cell site. The greater the concentration of cell sites, the smaller the coverage area. As data usage from cell phones has increased, wireless carriers have installed more cell sites to handle the traffic. That has led to increasingly compact coverage areas, especially in urban areas.
>
> Wireless carriers collect and store CSLI for their own business purposes, including finding weak spots in their network and applying "roaming" charges when another carrier routes data through their cell sites. In addition, wireless carriers often sell aggregated location records to data brokers, without individual identifying information of the sort at issue here. While carriers have long retained CSLI for the start and end of incoming calls, in recent years phone companies have also collected location information from

the transmission of text messages and routine data connections. Accordingly, modern cell phones generate increasingly vast amounts of increasingly precise CSLI.

*Carpenter*, 138 S. Ct. at 2211–12.

The Court noted that, whether a person has a recognized expectation of privacy in his CSLI records "lie[s] at the intersection of two lines of cases . . . ," the first dealing with a person's physical movements and location, and the second dealing with people who voluntarily turn over their records to a third party. *Id.* at 2214–15.

### 2. Physical Movements and Location

In the first set of cases, the Court examined its decisions in *United States v. Knotts*, 460 U.S. 276 (1983) and *United States v. Jones*, 565 U.S. 400 (2012). In *Knotts*, the Supreme Court held that monitoring a person's location through the use of a surreptitiously planted radio transmitter (a beeper) to track a person's movements and location was not a Fourth Amendment search if the transmitter was in a public place. *Knotts*, 468 U.S. at 285. But it noted that using a transmitter in a private place to track a person's movements and location might constitute a Fourth Amendment search. *Id.* at 283–84. It said that its holding was based on "the 'limited use which the government made of the signals from this particular beeper' during a discrete 'automotive journey'" and that different constitutional principles might be applicable if "twenty-four hour surveillance of any citizen of this country [were] possible." *Carpenter*, 138 S Ct. at 2215 (punctuation in original) (citing *Knotts*, 468 U.S. at 283–84). In *United States v. Jones*, 565 U.S. 400 (2012), the Court addressed whether police violated the Fourth Amendment

when they attached a GPS device onto Jones's vehicle without a warrant, then monitored the vehicle's movements twenty-four hours a day for 28 days. *Id.* at 404-005. The Court found in favor of Jones, but its holding was not based on the *Katz* expectation-of-privacy-test; it was based on the Fourth Amendment physical-trespass theory—the police violated Jones's Fourth Amendment rights when they attached a GPS device to his vehicle, his private property. *Id.* The *Carpenter* Court noted, however, that five justices also agreed that "'longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy'—regardless of whether those movements were disclosed to the public at large.'" *Id.* at 2215.

### 3. Third-Party Doctrine

In the second line of cases, the Supreme Court discussed *United States v. Miller*, 425 U.S. 435 (1976) and *Smith v. Maryland*, 442 U.S. 735 (1979). In *Miller*, the Court held that it was not a Fourth Amendment search when the Government, during a tax evasion investigation, subpoenaed copies of canceled checks, deposit slips, and monthly statements. Miller, 425 U.S. at 446. The Court reasoned that Miller did not own or possess the records; rather, they were third-party business records. *Id.* at 442. It also said that the records at issue "were 'not confidential communications but negotiable instruments to be used in commercial transactions'" and that "the bank statements contained information 'exposed to [bank] employees in the ordinary course of business.'" *Id.* In *Smith*, the Supreme Court applied the third-party doctrine to the Government's use

of a pen register. *Smith*, 442 U.S. at 742. The Court held that a person does not have an expectation of privacy in dialed phone numbers because the person "realize[s] that they must 'convey' phone numbers to the telephone company, since it is through the telephone company switching equipment that their calls are completed." *Id.*

### 4. CSLI is Different

The Court found all the cases to be distinguishable. It reasoned that CSLI presents even greater privacy concerns than following people through public thoroughfares or attaching a GPS tracker to a vehicle because cell phones are "almost a 'feature of human anatomy" that "track[] nearly exactly with the movements of its owner," and, "[w]hile individuals regularly leave their vehicles, they compulsively carry cell phones with them all the time. A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales." *Carpenter*, 138 S. Ct. at 2218.

It continued that, "when the Government tracks the location of a cell phone[,] it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user," and it concluded that giving the Government access to such records contravenes society's expectation "that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period." *Id.* at 2217–18. Not only does CSLI "hold for many Americans the 'privacies of life,'" the Supreme Court explained, accessing CSLI is

"easy, cheap, . . . efficient compared to traditional investigative tools," and it can be accessed at practically no expense. *Id.* Further, unlike GPS location information, historical CSLI is retrospective up to five years and "runs against everyone," meaning that the "police need not even know in advance whether they want to follow a particular individual, or when. Whoever the suspect turns out to be, he has effectively been tailed every moment of every day for five years . . . . Only the few without cell phones could escape this tireless and absolute surveillance." *Id.*

The Supreme Court also said that CSLI records are an "entirely different species of business record" that "implicate[] basic Fourth Amendment concerns about arbitrary government power much more directly than corporate tax or payroll ledgers" and that "[c]ell phone location information is not truly 'shared' as one normally understands the term." *Id.* at 2222. Unlike the records at issue in *Miller* and *Smith*, it reasoned, CSLI records are created "without any affirmative act on the part of the user beyond powering up" and that, "[a]part from disconnecting the phone from the network, there is no way to avoid leaving behind a trail of location data. As a result, in no meaningful sense does the user voluntarily 'assume[ ] the risk' of turning over a comprehensive dossier of his physical movements." *Id.* at 2220. Lastly, it was concerned that, if the third-party doctrine was applied to CSLI, the Government could access that information "by subpoena for no reason other than 'official curiosity.'" *Id.* at 2222.

Ultimately, the Supreme Court declined to apply the third-party doctrine to CSLI

and held that the Government undertook a Fourth Amendment search when it accessed Carpenter's CSLI. *Id.* at 2221.

### c. Analysis

The question we must answer now is whether the Supreme Court's analysis in *Carpenter* is persuasive, or whether we should take the position that Texas citizens have less privacy rights under the Texas Constitution than the United States Constitution based on a Supreme Court doctrine that even it has declined to apply to CSLI. We think that it makes more sense to adopt the Supreme Court's reasoning in *Carpenter* and to no longer apply the third-party doctrine to CSLI records under Article I, Section 9.[17]

Generally, "[a]bsent some significant difference in the text of the two provisions, or some historically documented difference in attitude between the respective drafters," "[w]e will not read Article I, [Section] 9 differently than the Fourth Amendment in a particular context simply because we can."[18] *Hankston*, 517 S.W.3d at 115 (quoting

---

[17]Judge Yeary says that once this Court interprets a provision of the Texas Constitution, that interpretation can never change absent a constitutional amendment. But that cannot be correct. What if, for example, this Court interprets a provision of our Constitution, but a new historical document is discovered in which the Framers explained exactly what they meant, and it is not what we said? Are the citizens of Texas to be deprived, in perpetuity, of a correct interpretation of their Constitution because we already guessed what it meant and were wrong? This Court's understanding of the Texas Constitution can change.

[18]Judge Yeary suggests that we mean that Article I, Section 9 and the Fourth Amendment must be interpreted in lockstep unless there is a significant difference in the language or in the documented intent of the framers of the Texas and federal constitutions. That is incorrect. What we mean is that we will not interpret Article I, Section 9 differently than the Fourth Amendment just for the sake of being different, especially when there is no significant difference in the language of the text or the documented intent of the framers.

*Crittenden*, 899 S.W.2d at 673 n.8). But there is no significant difference in the text of Article I, Section 9 and the Fourth Amendment,[19] and we are unaware of any historically documented difference in which the Framers of the 1876 Texas Constitution (or the framers of prior Texas constitutions for that matter) thought that Texas citizens should enjoy less protection from unreasonable searches and seizures under the Texas Constitution than the United States Constitution.

Our research shows that our framers shared the same concerns as the Framers of the United States Constitution, including their disdain for general warrants.[20] In fact, the

---

[19]The original predecessor to Article I, Section 9 was quite different from the language of the Fourth Amendment. *See* CONST. OR FORM OF GOV'T OF THE STATE OF TEX. art. V (1833); *infra*, note 21. It was almost identical to Article XI, Section 7 of the earlier 1796 Tennessee Constitution. By the time of the adoption of the Constitution of the Republic of Texas (1836) three years later, however, the language had been changed until it was almost identical to the Fourth Amendment,

> The People shall be secure in their persons, houses, papers, and possessions, from all unreasonable searches or seizures, and no warrant shall issue to search any place or seize any person or thing, without describing the place to be searched or the person or thing to be seized, without probable cause, supported by oath or affirmation.

REPUB. TEX. CONST. OF 1836, DECLARATION OF RIGHTS at 5th, *reprinted in* 1 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 1082–1083 (Austin, Gammel Book Co. 1898). Virtually without change, that provision was included in the 1845, 1861, 1866, 1869, 1876 constitutions. TEX. CONST. of 1845, art. I, § 7; TEX. CONST. of 1861, art. I, § 7; TEX. CONST. of 1866, art. I, § 7; TEX. CONST. of 1869, art. I, § 7; TEX. CONST. of 1876, art. I, § 9.

[20]In 1833, the people of Texas adopted a document titled the "Constitution or Form of Government of the State of Texas." CONST. OR FORM OF GOV'T OF THE STATE OF TEX. (1833). The signatories sought to establish Texas as its own State within the United Mexican States. This was the first Texas governing document based primarily on Anglo legal principles, and it provided protection from unreasonable searches and seizures,

> The people shall be secure in their persons, houses, papers, and possessions, from

first Texas prohibition on unreasonable searches and seizures, unlike the Fourth Amendment, specifically cited general warrants, which were widely condemned as dangerous to liberty because they permitted authorities to search wherever and seize whomever they desired without evidence of criminal activity.[21] CONST. OR FORM OF GOV'T OF THE STATE OF TEX. art. V (1833). The framers of later Texas constitutions incrementally changed the language of that prohibition until it was almost identical to the Fourth Amendment. We also note that the Framers of the 1845 Texas Constitution moved the prohibition from the Declaration of Rights to the new Bill of Rights (Article I, Section 9), which was modeled after the first eight amendments of the federal Bill of Rights. J.E. Ericson, *Origins of the Texas Bill of Rights*, 62 SW. HIST. Q. 457, 458 (Apr. 1959); *compare* U.S. CONST. amends. I–VIII, *with* TEX. CONST. art. I.

---

> unreasonable searches and seizures: and general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person, or persons, not named, who offences are not particularly described, and supported by evidence, are dangerous to liberty, and *shall not be granted*.

*Id.* art. V (emphasis in original). Signatories include Samuel Houston and Stephen F. Austin, who was later imprisoned when he traveled to Mexico to present the document to Mexican authorities. As is evident from Article V, the Texas Framers, like the federal Framers, were gravely concerned about general warrants that authorized government agents to search anywhere and to seize anyone without evidence of criminal wrongdoing. TEX. CONST. art. I, § 9 interp. commentary at 1–2 (citing *Wilkes v. Wood*, 19 HOW. ST. TRIALS 1153 (1763)); *see Carpenter*, 138 S. Ct. at 2213 (general warrants and writs of assistance of paramount concern to the Framers); *Hulit*, 982 S.W.2d at 436 ("Insofar as Article I, Section 9 of the Texas Constitution was directed at preventing the same evil that the Fourth Amendment was intended to prevent, the history of the Fourth Amendment informs our interpretation of its meaning.").

[21]*See supra*, note 21.

If it was logical in our original *Hankston* opinion to apply the Fourth Amendment third-party doctrine to CSLI because of the similarities of the Fourth Amendment and Article I, Section 9, and because we predicted that the Supreme Court would do so when it decided *Carpenter*,[22] it would be illogical to abandon that reasoning today if the only difference was that the Supreme Court decided *Carpenter* in a way that we did not expect. But that is not the only difference. The Supreme Court exhaustively analyzed the privacy issues implicated by CSLI, which we did not do in our original *Hankston* opinion, and we share the Court's grave concerns about the Government's ability to use a continuous, surreptitious, precise, and permeating form of surveillance to continually track its citizens' every move retrospectively for up to five years. The same privacy concerns are implicated regardless of whether CSLI is accessed under the Fourth Amendment or Article I, Section 9. Further, we have reviewed the constitutional debates in Texas, which we did not previously do, and they show no intention on the part of our framers for Texas citizens to have less protection from unreasonable searches and seizure under the Texas Constitution than the United States Constitution.[23]

---

[22]In *Ford*, we held that cell phone users voluntarily convey their CSLI information to their service providers and noted that a person need not own a cell phone, and if they do, they know that CSLI is gathered and maintained by the service provider. *Hankston*, 517 S.W.3d at 121. Our reasoning was expressly rejected in *Carpenter*. The Supreme Court said that "[c]ell phone location information is not truly 'shared' as one normally understands the term" and that "[o]nly the few without cell phones could escape this tireless and absolute surveillance." *Carpenter*, 138 S. Ct. at 2220, 2222.

[23]Judge Yeary indicates that we mean Article I, Section 9 can never be construed to provide less protections than the Fourth Amendment, but that is not true. What we mean is that

Despite all of this, we could continue to apply the Fourth Amendment third-party doctrine, but we think that doing so would, at best, amount to us being different just because we can. *See Crittenden*, 899 S.W.2d at 673 n.8 (declining to interpret Article I, Section 9 differently than the Fourth Amendment "simply because we *can*") (emphasis in original). So we decline to do so. We hold that the third-party doctrine alone cannot defeat a person's expectation of privacy in at least 23 days of historical CSLI under Article I, Section 9.

Having decided that Appellant had a protected privacy interest in his CSLI, the next question is whether the search was nonetheless reasonable. TEX. CONST. art. I, § 9. As we have previously noted, post-*Carpenter*, a warrant is generally needed under the Fourth Amendment to access seven or more days CSLI information,[24] but there is no implied warrant requirement in Article I, Section 9. *Hulit*, 982 S.W.2d at 436. The pertinent inquiry is simply whether the search was reasonable under the totality of the circumstances "after considering the public and private interests that are at stake . . . ."[25]

---

there is no definitive historical evidence that the framers intended for Texas citizens to have less protection from searches and seizures under the Texas Constitution than the federal Constitution. We have, in fact, twice construed Article I, Section 9 to be less protective. First, in *Welchek v. State*, 247 S.W. 524, 529 (Tex. Crim. App. 1922), we concluded that there is no implied suppression remedy in the language of Article I, Section 9, although the Supreme Court later read one into the Fourth Amendment. Second, in *Hulit*, we declined to import the Supreme Court's view that there is an implied warrant requirement into Article I, Section 9. *Hulit*, 982 S.W.2d at 436.

[24]*Carpenter*, 138 S. Ct. at 2217 n.3.

[25]*Id.* ("[T]he central inquiry under the Fourth Amendment is the reasonableness of the search or seizure under the totality of the circumstances," and we find that approach "consistent

*Id.*

The private interest at stake here is Appellant's right to be free from unreasonable searches of his historical CSLI records. The public interest at stake is the State's conventional interest in investigating and prosecuting crimes. Generally, an Article I, Section 9 search is unreasonable absent probable cause, exigent circumstances, or some other recognized law-enforcement need. Here, because the State was acting in its traditional crime-fighting role, and it did not allege exigent circumstances or some other recognized law-enforcement need, the search had to be supported by probable cause to be reasonable. However, the State concedes that the petition does not support a probable-cause finding.[26] We agree.[27]

**HARM**

Having concluded that the seizure of Appellant's historical CSLI was unreasonable under Article I, Section 9 and that the trial court should have granted Appellant's motion to suppress, the next question is whether Appellant was harmed when the trial court failed to suppress the records under Article 38.23(a). We do not reach that

with the language of Article I, Section 9 of the Texas Constitution."); *Carpenter*, 138 S. Ct. at 2221 ("[T]he 'ultimate measure of the constitutionality of a governmental search is reasonableness . . . .") (punctuation omitted).

[26]Oral Arg., *Holder v. State*, PD-1269-16, at 38:54–39:40 (Sept. 27, 2017).

[27]The petition stated that "[t]he cellular telephone was used by a possible suspect to communicate with unknown persons and obtaining the locations of the handset will allow investigators to identify if this suspect was in the area at the time of the offense and will provide investigators leads in this case."

issue, however. Instead, we remand this cause to the court of appeals for it to address the issue in the first instance.

## CONCLUSION

Because we conclude that Appellant had a reasonable expectation of privacy under Article I, Section 9 in the 23 days of his CSLI accessed by the State, we reverse the judgment of the court of appeals, but we remand the cause for the lower court to determine whether Appellant was harmed by the erroneous admission of the CSLI records.[28]

Delivered: March 11, 2020

Publish

---

[28]Appellant filed a motion to remand so the court of appeals could consider *Carpenter*. Because his motion is now moot, we dismiss it.