

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00169-CR

———————————————

MARIO HERNAN LOPEZGAMEZ, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from Criminal District Court No. 4
Tarrant County, Texas
Trial Court No. 1487696D

---

Before Sudderth, C.J.; Birdwell and Womack, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

Appellant Mario Hernan LopezGamez appeals his conviction for the capital murder of April VanCleave, whom he shot and killed while stealing jewelry that she was trying to sell to support her financially strapped family. In five points, he takes issue with the trial court's refusal to suppress certain evidence (points one through three), admission of conditionally admitted evidence (point four), and rejection of his proposed jury charge instruction (point five). We affirm his conviction.

## Background

### I. The murder

In December 2016, VanCleave decided to sell some of her jewelry, including two gold chains and a gold ring, because she and her husband, Mustafah Zaatreh, were struggling financially. Using the phone application 5miles, VanCleave listed the jewelry and set up a meeting with a potential buyer, "Juana Ayala," at a Starbucks inside a nearby Target at 11:00 a.m. on December 15.

The evidence at trial indicated that VanCleave and Zaatreh were late for the December 15 meeting. Just before 11:30 a.m. that day, the two arrived at Target and parked their gold Kia in the lot to the side of the building. As they walked inside, Zaatreh noticed two men standing outside the entrance. Once he and VanCleave entered the Starbucks, they waited to meet Juana Ayala, but after receiving a text from her indicating that she was not coming after all, they left Starbucks, returned to their Kia, and drove back to their apartment, which was just minutes away. Zaatreh dropped

VanCleave off outside their apartment, and then he left to see a friend about a part-time job. While dropping her off, he noticed a red pickup in the parking lot that stopped when he stopped, but he thought nothing of it at the time. As Zaatreh drove away, he had no idea his wife was about to be robbed and murdered.

Moises Castruita was walking through the apartment complex that morning when he suddenly heard a woman loudly scream, "What are you doing? Get off me," or "Let go." He looked up and saw VanCleave standing on the sidewalk ahead of him, with a "stocky" Hispanic or Mexican man "very close to her" who "looked like he was trying to strip her from like a bag or like he was pulling on her." Then Castruita heard a bang and saw the man turn and walk toward a nearby carport.

Neighbor Michael Arana heard the bang, looked out his apartment window, and saw a "red truck with a man running towards the passenger-side door." Arana testified that the red truck was parked diagonally across two parking spots beneath a carport, "probably about 30 to 50 feet away from [his] unit." At trial, he described the man who ran to and got in the truck as "heavier-set" and the man driving the truck as "skinny," and he said both appeared to be "Mexican." As soon as the man got in the truck, it left the apartment complex. Then Arana saw VanCleave lying on the sidewalk, so he and his girlfriend both called 911. Police Officer Tasha Matthews found VanCleave lying

3

on her side, breathing with difficulty, and holding close to her face a keychain containing a little girl's photograph.[1]

VanCleave was rushed to the hospital where she died from the gunshot wound.

## II. The initial investigation

Arlington Police Detective Caleb Blank took the lead in investigating VanCleave's murder. Based on Zaatreh's account of the attempted jewelry sale, Detective Blank went to the nearby Target and reviewed security footage. In it, he noticed that two men matching the neighbors' suspect descriptions—two Hispanic or Mexican males, one heavy-set and the other thin—arrived at the Target parking lot at approximately 11:18 a.m. on December 15 in a red Ford F-150. The two men entered Target, walked to the Starbucks inside, and walked through the seating area. Throughout the footage, the heavyset male looked at his phone often and appeared to be typing on his phone. After walking through Starbucks and lingering outside the Starbucks entrance for about five minutes, the men exited Target and stood outside by the entry doors closest to Starbucks. At 11:30 a.m., as Zaatreh and VanCleave entered Target through those doors, the heavyset man watched VanCleave closely. Within two minutes, the two men followed Zaatreh and VanCleave into Target, lingering in the produce area just outside of Starbucks while Zaatreh and VanCleave took a seat inside

---

[1]VanCleave had a nine-year old daughter and wanted to sell her jewelry so that her daughter could enjoy Christmas.

Starbucks. After a minute, the two men walked to the exit on the other side of Target, got back into the red F-150, and drove to the side parking lot where they had seen VanCleave and Zaatreh walk from before entering Target. At 11:47 a.m., VanCleave and Zaatreh left Target, walked around the building, and got into their Kia, which was two parking spots away from the red F-150 with the two men. Within seconds of Zaatreh's backing the Kia from its spot and driving out of the lot, the red pickup pulled out of its spot and followed in the same direction. Footage obtained from a pharmacy across the street from Zaatreh's and VanCleave's apartment complex showed the Kia turning into the complex at approximately 11:51 a.m. and the red F-150 turning in behind it about 20 seconds later. The same camera captured the red F-150 speeding out of and away from the complex five minutes later.

To identify the two men, Detective Blank found VanCleave's 5miles posting for the jewelry under the profile name "Kameyla." With a search warrant served on 5miles, he obtained VanCleave's 5miles profile information and communications, including the following December 15 communication with "Juana Ayala" about the December 15 meeting:

11:08 a.m.[2]   Ayala:  Are you on the way?
11:10 a.m.      Ayala:  ?
11:15 a.m.      Ayala:  How long till you arrive so I can manage time?
11:19 a.m.      VanCleave:  Are you there?

---

[2]Detective Blank testified that the original records were timestamped in coordinated universal time, six hours ahead of the local time zone. We have adjusted the time to reflect Central Standard Time, as testified to by Detective Blank.

5

| | |
|---|---|
| 11:19 a.m. | Ayala: I need to know how long you will take |
| 11:21 a.m. | VanCleave: 10 minutes |
| 11:21 a.m. | Ayala: Ok |
| 11:25 a.m. | VanCleave: Where are you |
| 11:27 a.m. | VanCleave: Here |
| 11:28 a.m. | Ayala: Hello |
| 11:30 a.m. | VanCleave: I'm in Starbucks |
| 11:31 a.m. | VanCleave: Waiting |
| 11:32 a.m. | Ayala: Where are you sit[t]ing |
| 11:33 a.m. | VanCleave: ? |
| 11:34 a.m. | VanCleave: How long |
| 11:38 a.m. | VanCleave: ? |
| 11:39 a.m. | VanCleave: Waiting |
| 11:42 a.m. | VanCleave: Are you here? |
| 11:43 a.m. | VanCleave: Response please |
| 11:44 a.m. | Ayala: I have emergencia in my home |
| 11:44 a.m. | Ayala: I see you later |

GPS coordinate information disclosed by 5miles indicated that the person using the Juana Ayala profile was in the same area as Target during these communications with VanCleave. Detective Blank also used the GPS information obtained from 5miles to ascertain that the profile user lived in the same apartment complex in Dallas where two apartment-complex employees identified Appellant and his wife, Keyla Pineda Ayala, as former tenants.[3] GPS data obtained from 5miles also led Detective Blank to

---

[3]Those employees also informed Detective Blank that Appellant, his wife, and his two children had abandoned their apartment in mid-December. They identified Appellant and his wife as the owners of the red F-150 recorded in the Target surveillance footage and provided photographs of all of the property that had been left behind, including children's toys, furniture, and sneakers left soaking in tubs of bleach in the apartment bathtub.

believe that Appellant and his wife may have moved to Houston after abandoning their Dallas apartment.

## III. The arrest and subsequent searches

### A. Arrest

Detective Blank obtained an arrest warrant for Appellant and forwarded it with copies of documents regarding Appellant's red F-150 to Arlington Police Department Detective Troy Medina and special deputy with the U.S. Marshals Task Force. Detective Medina determined that Appellant purchased a red F-150 from Don Carro, a Dallas-area "tote-the-note" dealership, and that part of the purchase agreement included permission for Don Carro to track the GPS location of the pickup in the event it had to be repossessed. Detective Medina visited the dealership and, using this GPS tracking device, a Don Carro representative identified the real-time GPS location of the red F-150 as in a Houston trailer park. That information was passed along to the Gulf Coast Fugitive Task Force, which conducted surveillance on the park, located the F-150, and identified and arrested Appellant.

### B. Search of trailer

Upon learning of the arrest, Detective Blank went to Houston to see the trailer in which Appellant and his family had been living and to seize the red F-150. When he arrived at the trailer with two other officers, no one was home, but the back door to the trailer was open. Through it, Detective Blank could see shoes resembling those worn by Appellant in the Target surveillance footage—grey shoes with distinctive

orange stripes. He obtained a warrant to search inside the trailer, and in addition to the shoes he found a white and blue shirt resembling that worn by Appellant in the Target surveillance footage, a set of tires resembling those on the F-150 in the Target surveillance footage, and a black Samsung Galaxy Note 7.

The Samsung phone was particularly significant because the materials produced by 5miles indicated that the "Juana Ayala" profile was accessed and used through a Samsung Galaxy Note 7. Arlington police later extracted data from the phone,[4] including several photos and text-message conversations, including:

- photos of Appellant wearing a brown jacket with a gray hood similar to the jacket he wore in the Target surveillance footage;

- photos that showed Appellant and his family in their later-abandoned Dallas apartment;

- photos of Appellant wearing gray Nike shoes with orange trim similar to those he wore in the Target surveillance footage and which were recovered from the Houston trailer;

- a photo of Appellant wearing a white shirt with a blue pattern similar to the one he wore in the Target surveillance footage;

- a photo of a gold chain;

- a video from the day before the murder depicting Appellant and his family in their Dallas apartment, and in which Appellant had longer hair and facial hair;

- a video from the day after the murder in which Appellant's hair was shorter, he had no facial hair, and he was in a Houston-area mall with his family;

---

[4]The extraction was performed pursuant to a search warrant.

8

- the profile photo used in the "Juana Ayala" profile on 5miles; and

- text-message conversations between Appellant and his suspected codefendant, Alex Menor, in the days before and after the murder.

The extracted data also revealed that the 5miles app had previously been downloaded to the phone, registered to "Juana Ayala," and later deleted. It also indicated that a user had searched for the app within the Samsung "Play" store on December 15, 16, and 27.

## C. Search of the pickup

The F-150 was seized by the U.S. Marshals upon Appellant's arrest and was subsequently escorted by Detective Blank to Arlington via a wrecker service. After acquiring a search warrant for the F-150, Detective Blank found a Blue ZTE phone in the driver's side door pocket. It was damaged beyond repair and could not be turned on.

## D. Pawn shop recovery

Detective Blank also obtained evidence from a database of Texas pawnshop transactions showing that Keyla Ayala had sold a gold ring to a Houston pawnshop on January 4, 2017. He contacted the Houston pawnshop, confirmed that Keyla Ayala had pawned a gold ring, and retrieved the gold ring. He testified that the ring matched the photograph of a gold ring posted by VanCleave on 5miles.

## IV. The trial and conviction

A jury convicted Appellant of the capital murder of VanCleave. The trial court sentenced him to life in prison without parole. This appeal followed.

### Discussion

Appellant brings five points on appeal. His first, second, and third points relate to the denial of his pretrial motions to suppress certain evidence recovered by the State. His fourth point complains about the admission of evidence found in the red F-150. His fifth and final point complains about the trial court's refusal to include a requested instruction in the jury charge.

## I. Suppression motions

Appellant's first three points challenge the trial court's denial of his motions to suppress (1) evidence gained as a result of Appellant's arrest with the aid of GPS tracking from the car dealership and (2–3) evidence obtained from the Samsung phone.

### A. Standard of Review

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). Because the trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony, *Wiede v. State*, 214 S.W.3d 17, 24–

10

25 (Tex. Crim. App. 2007), we defer almost totally to the trial court's rulings on (1) questions of historical fact, even if the trial court determined those facts on a basis other than evaluating credibility and demeanor, and (2) application-of-law-to-fact questions that turn on evaluating credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez*, 195 S.W.3d at 108–09; *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the witnesses' credibility and demeanor, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

We must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the record is silent on the reasons for the trial court's ruling, or when there are no explicit fact findings and neither party timely requested findings and conclusions from the trial court, we imply the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *see Wiede*, 214 S.W.3d at 25. We then review the trial court's legal ruling de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling. *Kelly*, 204 S.W.3d at 819.

## B. GPS tracking and Appellant's arrest

In his first issue, Appellant argues that the trial court erred by denying his motion to suppress all evidence stemming from his arrest because Detective Medina's procurement of GPS tracking information from Don Carro violated his Fourth Amendment right against unreasonable searches.

The Fourth Amendment protects against unreasonable searches and seizures by government officials. U.S. Const. amend. IV; *Wiede*, 214 S.W.3d at 24. A defendant seeking to suppress evidence on Fourth Amendment grounds bears the initial burden to produce some evidence that the government conducted a warrantless search or seizure that he has standing to contest. *State v. Martinez*, 569 S.W.3d 621, 623 (Tex. Crim. App. 2019) (quoting *Russell v. State*, 717 S.W.2d 7, 9 (Tex. Crim. App. 1986), *disavowed in part on other grounds by Handy v. State*, 189 S.W.3d 296, 299 n.2 (Tex. Crim. App. 2006)); *Handy*, 189 S.W.3d at 298–99; *see, e.g., Rawlings v. Kentucky*, 448 U.S. 98, 104–05, 100 S. Ct. 2556, 2561 (1980). Once the defendant does so, the burden shifts to the State to prove either that the search or seizure was conducted pursuant to a warrant or, if warrantless, was otherwise reasonable. *Martinez*, 569 S.W.3d at 623 (quoting *Russell*, 717 S.W.2d at 9); *Amador*, 221 S.W.3d at 672–73.

Whether a search is reasonable is a question of law that we review de novo, measuring reasonableness by examining the totality of the circumstances. *Kothe v. State*, 152 S.W.3d 54, 62–63 (Tex. Crim. App. 2004). In the process, we must balance the public interest and the individual's right to be free from arbitrary detentions and

intrusions. *Id.* at 63. A warrantless search is per se unreasonable unless it falls within one of the "specifically defined and well established" exceptions to the warrant requirement. *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003); *see Best*, 118 S.W.3d at 862.

To argue that the acquisition of the pickup's GPS location from Don Carro was an unreasonable and therefore unlawful search, Appellant relies primarily on the United States Supreme Court's 2012 *Jones* and 2018 *Carpenter* decisions' applications of the Fourth Amendment to situations of GPS tracking using modern-day technology. *Carpenter v. United States*, 138 S. Ct. 2206 (2018); *United States v. Jones*, 565 U.S. 400, 132 S. Ct. 945 (2012). But both *Jones* and *Carpenter* (which was limited to cell-site location information) are distinguishable from the situation at hand.

*Jones* involved the government's attachment of a GPS tracking device to a suspect's car without the suspect's knowledge and its use of the device to track his movements for about a month. 565 U.S. at 403, 132 S. Ct. at 948. The Supreme Court held that the attachment of the device was a search within the meaning of the Fourth Amendment and emphasized that "[t]he Government physically occupied private property for the purpose of obtaining information." *Id.* at 404, 132 S. Ct. at 949. Here, the government did not attach the GPS tracking device to Appellant's pickup. The tracking device was installed by Don Carro alone, and with Appellant's permission. *Jones* is therefore inapplicable to these facts.

13

In its examination of cell-site location information ("CSLI") obtained from a cell phone, the Supreme Court in *Carpenter* traced the evolution of Fourth Amendment law in light of "innovations in surveillance tools," which have "enhanced the Government's capacity to encroach upon areas normally guarded from inquisitive eyes." 138 S. Ct. at 2214. Recognizing that the digital data collected by cell phones in particular did not fit neatly under existing precedents addressing "personal location information maintained by a third party," the Court distinguished CSLI from other surveillance methods. *Id.* at 2214–15. While it recognized and kept intact the precedent that a person holds no legitimate privacy interest in information he voluntarily turns over to third parties, "even if the information is revealed on the assumption that it will be used only for a limited purpose," *id.* at 2216 (citing *Smith v. Maryland*, 442 U.S. 735, 743–44, 99 S. Ct. 2577, 2582 (1979); and quoting *United States v. Miller*, 425 U.S. 435, 443, 96 S. Ct. 1619, 1624 (1976)), the Court declined to extend these concepts to cover CSLI, holding,

> Given the unique nature of cell phone location records, the fact that the information is held by a third party does not by itself overcome the user's claim to Fourth Amendment protection. Whether the government employs its own surveillance technology as in *Jones* or leverages the technology of a wireless carrier, we hold that an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI.

*Id.* at 2217. It went on to expressly state that CSLI "present[s] even greater privacy concerns than the GPS monitoring of a vehicle . . . considered in *Jones*," labelling cell phones as "almost a 'feature of human anatomy.'" *Id.* (quoting *Riley v. California*, 573 U.S. 373, 385, 134 S. Ct. 2473, 2484 (2014)). "[W]hen the government tracks the

location of a cell phone it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user." *Id.* Comparatively, "individuals regularly leave their vehicles." *Id.* In *Carpenter*, the Court made a point of not addressing the collection by law enforcement of real-time GPS information. *Id.* at 2220 ("We do not express a view on matters not before us: real-time CSLI . . . ."); *see also Sims v. State*, 569 S.W.3d 634, 645–46 (2019) (holding there was no violation of defendant's privacy expectations by law enforcement's retrieval of less than three hours of real-time CSLI tracking).

*Carpenter* does not apply to the facts here. Here, Appellant and his wife agreed, as a condition of their purchase, to allow Don Carro to access the F-150's whereabouts through a real-time GPS tracking device. Thus, they voluntarily turned over their location information to a third party, and by so doing they relinquished their expectation of privacy in that information. *See Smith*, 442 U.S. at 743–44, 99 S. Ct. 2577, 2582; *Miller*, 425 U.S. at 443, 132 S. Ct. at 1624.

Appellant's argument also ignores a fundamental difference between CSLI from a cell phone and vehicle GPS-tracking devices. The purpose of a cell phone is to communicate. Due to the technology that enables cell phones to work, a cell phone can also reveal its user's location and movements. Although this tracking capability is a consequence of a cell phone's use, location, and movement, tracking is not the cell phone's primary purpose. *See, e.g., Carpenter*, 138 S. Ct. at 2217 (highlighting the "unique nature of cell phone location records"). On the other hand, the essential purpose of a GPS device is to track a person's movements. When a person permits a GPS device to

be installed on a vehicle, that person has an affirmative expectation that his or her movements and locations will be tracked. Because of this fundamental difference between cell phones and GPS devices, we decline Appellant's request to extend the *Carpenter* holding with regard to CSLI to the retrieval of real-time GPS location information under the facts of this case.[5]

The trial court therefore did not err by denying Appellant's motion to suppress related to his arrest, and we overrule Appellant's first point.

## C. Samsung phone

In his second and third points, Appellant argues that the trial court erred by denying his motion to suppress evidence seized from his cell phone because the cell phone's seizure from the trailer was outside the scope of the search warrant.[6] He

---

[5]In any event, even if we were to hold that the location information was impermissibly obtained without a warrant, it would not taint all of the evidence procured as a result of Appellant's arrest. *See, e.g.*, *State v. Jackson*, 464 S.W.3d 724, 731 (Tex. Crim. App. 2015) ("[N]ot every but/for product of police illegality will constitute evidence 'obtained' from that illegality for either federal or state exclusionary rule purposes; evidence is not subject to suppression, in other words, 'simply because it would not have come to light but for the illegal actions of the police.'") (quoting *State v. Mazuca*, 375 S.W.3d 294, 300 (Tex. Crim. App. 2012)). And, since the location information was never introduced at trial, any error in failing to suppress it was harmless.

[6]Appellant labeled his argument as two points of error, but he phrased the point as one sentence and consolidated his argument into one section. We will likewise consolidate our discussion of the two points into one. Structurally, Appellant appears to have asserted his arguments in two points—one under Chapter 18 and the other under the Fourth Amendment.

contends that the seizure of the phone therefore violated Code of Criminal Procedure Chapter 18 and the Fourth Amendment. We disagree.

Article 18.02 authorizes the issuance of search warrants for certain enumerated categories of items, including "implements or instruments used in the commission of a crime" and, in a catchall provision, "property or items, except the personal writings by the accused, constituting evidence of an offense or constituting evidence tending to show that a particular person committed an offense." Tex. Code Crim. Proc. Ann. art. 18.02(a)(9), (10). Commonly referred to as the "mere evidence" provision, this catchall provision of Article 18.02(a)(10) applies only when the other articles do not. *State v. Young*, 8 S.W.3d 695, 699 (Tex. App.—Fort Worth 1999, no pet.). It does not grant unrestrained power; rather, Article 18.01(d) places a limitation on items seized, stating that "[o]nly the specifically described property or items set forth in a search warrant issued under Article 18.02(a)(10) or property, items[,] or contraband enumerated in Article 18.02(a)(1), (2), (3), (4), (5), (6), (7), (8), (9), or (12) may be seized." *Id.* art. 18.01(d). Appellant asserts that the trailer warrant is a "mere evidence" warrant, and because it did not specifically name the Samsung phone as its target, the seizure of the phone was unlawful.

We disagree. As we explained in *Young*, "plain view evidence" is not the same as "mere evidence" collected under authority of Article 18.02(a)(10). *Young*, 8 S.W.3d at 699. "Plain view evidence" is evidence connected with a crime that does not consist of fruits, instrumentalities, or contraband. *Id.* (citing *Joseph v. State*, 807 S.W.2d 303, 307

17

(Tex. Crim. App. 1991)). "Mere evidence," on the other hand, refers "only to those items sought and described in a warrant issued under [A]rticle 18.02[(a)](10)." *Id.* (citing *Reeves v. State*, 969 S.W.2d 471, 482 (Tex. App.—Waco 1998, pet. ref'd)). "[W]hile 'plain view' evidence may be properly seized with respect to searches authorized by [mere evidence] warrants, . . . evidence discovered during a search authorized by a [mere evidence] warrant . . . must be specifically described in that warrant." *Id.* The plain view doctrine permits the seizure of evidence only if: (1) the officer was in the proper position to view the evidence or was lawfully present on the premises; and (2) the fact that the officer has discovered evidence is immediately apparent. *Id.* (citing *Joseph*, 807 S.W.2d at 308).

In *Young*, a detective procured a warrant to search the appellee's apartment for a 9mm pistol used by the appellee in committing a crime. *Id.* at 697. While in the appellee's apartment, the detective did not find the gun but did find several accessories for a 9mm pistol, including a gun case, spent casings, and ammunition. *Id.* We held that the evidence was admissible despite not being specifically identified in the warrant because they were reasonably related to the offense. *Id.* We noted, "Officers do not have to 'know' that the items are incriminating[,] . . . the facts available to the officer must merely suffice to enable a reasonable person to believe the items observed may be useful as evidence of a crime." *Id.* at 700 (citing *Texas v. Brown*, 460 U.S. 730, 742, 103 S. Ct. 1535, 1543 (1983)).

Here, Detective Blank's trailer-warrant affidavit alleged,

18

- that VanCleave had communicated with the potential jewelry buyers through a cell-phone application, 5miles;

- that in the Target surveillance video, Appellant was seen "using his cell phone and appear[ed] to be using it to message another person";

- that another citizen recognized Appellant as someone who had previously robbed her after setting up a transaction through another cell-phone application, "OfferUp," similar to 5miles; and

- that based on Detective Blank's experience, it is common for suspects involved in thefts and aggravated robberies to store proceeds "and other evidence from their crimes in their residences."

Detective Blank concluded, "Based upon seeing the suspect's shoes in plain view in the location, it is my belief that the location may have other evidence of the crimes of Capital Murder, Aggravated Robbery, and Theft." The trailer warrant incorporated the affidavit's contents for all purposes and authorized the search of the trailer and the seizure of "property or items constituting evidence of the offenses of Aggravated Robbery[,] Capital Murder, or Theft." Detective Blank found the Samsung phone on top of a shelf over the washer and dryer, just above his eye level.

The trailer warrant is therefore similar to that in *Young*, making clear that the warrant was sought to search for the proceeds and instruments used to commit the crime. *See id.* at 697. Detective Blank's affidavit referred to the use of a cell phone in the commission of the crime—it was used to set up the jewelry purchase with VanCleave, to communicate with VanCleave, and possibly to orchestrate a prior

19

robbery. It clearly linked the use of a cell phone with the commission of the crime itself and reflected "an intent to search for an instrument of the crime." *Id.* at 698.

Additionally, the phone was found in plain view, despite Appellant's argument otherwise. Detective Blank testified at the suppression hearing that he could see the Samsung phone sitting on the top shelf in the laundry room when he was standing on his "tiptoes," explaining, "it's not too tall of a trailer to begin with." The fact that he used the camera application of his own cell phone to confirm that it was a cell phone does not change the fact that he could see it in plain view from the outset. *See, e.g., Ruiz v. State*, 907 S.W.2d 600, 605 (Tex. App.—Corpus Christi-Edinburg 1995, no writ) (holding that use of a flashlight to see a gun did not prevent the gun from appearing in plain view). Detective Blank's discovery of the Samsung phone therefore complies with the plain-view doctrine: under the search warrant, he had a right to be in the space and he had probable cause to believe that the cell phone might hold incriminating evidence related to the crime. *See id.* at 699–700.

The trial court did not abuse its discretion by denying Appellant's motion to suppress the Samsung phone as evidence. We overrule Appellant's second and third points.

## II. Evidence found in the F-150

In his fourth point, Appellant argues that the State "failed to 'connect up' conditionally admitted evidence concerning the search of the pickup found in Houston." In support, he relies on his objection, argued in a hearing outside the jury's

20

presence, to the crime scene investigator's testimony to items found in a search of the red F-150:

> But the first point of objection is that the vehicle was seized in Houston from [Appellant]. We don't have the testimony on the record as to how the vehicle was seized, how it was located, how - - whether it was processed in Houston, and how it was transported from Houston to here. So there's no chain on the vehicle.
>
> . . . .
>
> Well, my first issue is that there's been no chain of custody shown in front of the jury as to this vehicle, which we're getting ready to discuss a search of. So it's - - we don't have the beginning of a chain of custody on it, so we object on that ground to start off with.

On appeal, he claims that the trial court allowed the crime scene investigator to testify to the search of the F-150 on the condition that Detective Blank "connect up" the testimony later by providing details of the pickup's chain of custody but that the detective never followed up, leaving the chain of custody issue unresolved..

The doctrine of conditional relevance allows a trial court to admit evidence lacking authentication on the condition that the party offering the evidence authenticate it, or "connect it up," at a later time. *Powell v. State*, 898 S.W.2d 821, 829 (Tex. Crim. App. 1994). But here, the premise of Appellant's complaint is fatally undermined by the record. Contrary to his assertion in his brief that Detective Blank "never established the chain of custody of the truck—specifically how it was retrieved from Houston, where it was stored, or who was in charge of it," Detective Blank did testify to those details. He testified, in front of the jury, that he examined and photographed the F-150

21

where it had been secured in the Harris County Sheriff's Office's enclosure bay, placed evidence stickers and seals on the pickup, supervised the loading of the F-150 onto a flatbed tow truck, and followed the tow truck during its transport from Houston to Arlington, where he obtained a search warrant before searching its contents.

Furthermore, because the chain-of-custody requirement is not intended to be stringently applied, if the trial court is satisfied that the evidence is what the proponent claims, any purported gaps or theoretical breaches in the chain of custody go to the weight of the evidence, not its admissibility. *Avila v. State*, 18 S.W.3d 736, 740 (Tex. App.—San Antonio 2000, no pet.) (citing *Medillin v. State*, 617 S.W.2d 229, 232 (Tex. Crim. App. [Panel Op.] 1981)); *see also Stoker v. State*, 788 S.W.2d 1, 10 (Tex. Crim. App. 1989) ("The chain of custody is conclusively proven if an officer is able to identify that he or she seized the item of physical evidence, put an identification mark on it, placed it in the property room, and then retrieved the item being offered on the day of trial.").

Because the chain of custody for the F-150 was properly established, the trial court did not abuse its discretion by overruling Appellant's objection to admission of evidence regarding the pickup and denying his motion to strike such evidence. We overrule Appellant's fourth point.

## III. Jury instruction

In his fifth and final point, Appellant argues that the trial court erred by refusing to include in the jury charge his requested language specifying that the jury should consider the charge as a whole and was not required to acquit on a greater offense

before considering a lesser offense. In considering his argument, we must first determine whether error occurred; if not, our analysis ends. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012).

The charge referred the jury to the indicted offense of capital murder, as well as the lesser-included offenses of murder, manslaughter, criminally negligent homicide, robbery, and aggravated robbery. Appellant's counsel proposed that each time the charge referred to a lesser-included offense, it also instruct the jury to view the charge as a whole and inform the jury that it did not have to first acquit Appellant of the greater charge before considering the lesser. For example, with regard to the murder charge, the State's proposed charge read:

> Unless you find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant of capital murder as charged in the indictment and next consider whether the Defendant is guilty of the lesser-included offense of murder. If you, however, find from the evidence beyond a reasonable doubt that the defendant is guilty of capital murder, you need not proceed to the lesser included offenses below.

Appellant requested the following language instead:

> Unless you find from the evidence beyond a reasonable doubt, or if you have reasonable doubt thereof, *or if you cannot agree that the Defendant is guilty of capital murder*, you will next consider whether the defendant is guilty of the lesser-included offense of murder. [Emphasis added.]

But the trial court declined to use that language, and instead the final charge given to the jury read:

> Unless you find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant of capital

23

murder as charged in the indictment and next consider whether the Defendant is guilty of a lesser-included offense. If you, however, find from the evidence that the defendant is guilty of capital murder, you need not proceed to the lesser included offenses below.

Appellant relies on *Barrios v. State* to argue that he was entitled to his requested instruction. 283 S.W.3d 348, 349 (Tex. Crim. App. 2009). In *Barrios*, which also involved a capital murder charge, the Court of Criminal Appeals found no error in the jury charge's instruction to acquit the defendant of capital murder before it could consider the lesser-included offense of robbery. *Id.* ("Unless you so find from the evidence beyond a reasonable doubt, or if you have reasonable doubt thereof, you will acquit the defendant of capital murder and next consider whether the defendant is guilty of robbery."). But it also noted that the charge included a benefit-of-the-doubt instruction:

> If you believe from the evidence beyond a reasonable doubt that the defendant is guilty of either capital murder on the one hand or robbery on the other hand, but you have a reasonable doubt as to which of said offenses he is guilty, then you must resolve that doubt in the defendant's favor and find him guilty of the lesser offense of robbery.

*Id.* at 349–50.

In evaluating the charge, the court acknowledged that the use of "acquit" can be troublesome and it suggested that

> [i]t may be that better practice is for trial courts to include an instruction that explicitly informs the jury that it may read the charge as a whole, and to substitute "or if you are unable to agree, you will next consider" for "you will acquit . . . and next consider" so that the charge makes clear to the jury that, at its discretion, it may consider the lesser-included offenses before making a final decision as to the greater offense.

24

*Id.* at 353. But, contrary to Appellant's argument, the court did not *require* the use of the "unable to agree" language that he sought to include in the charge. Instead, it reiterated the longstanding jurisprudence that charges are to be considered "as a whole":

> "The purpose of the law is to allow free discussion and interchange of opinions among jurors in order that proper verdicts may be rendered." *Caesar v. State*, 135 Tex. Crim. 5, 117 S.W.2d 66, 68 (Tex. Crim. App. 1983). They may consider the evidence "in light of the entire charge read as a whole." *Boyett* [*v. State*], 692 S.W.2d [512,] 516 [(Tex. Crim. App. 1985)]. The trial judge reads the entire charge to the jury before it retires to deliberate; the jurors will thereby have heard the instruction on the benefit of the doubt before considering the issue of guilt on any of the offenses included in the charge. Therefore, even if, and perhaps especially if, the jurors cannot agree as to guilt on the greater offense, they have already been instructed that they may consider guilt as to the lesser offense before deciding on a verdict as to the greater offense.

*Id.* at 352–53; *see also Slater v. State*, No. 02-11-00368-CR, 2013 WL 2631194 (Tex. App.—Fort Worth June 13, 2013, pet. ref'd) (mem. op., not designated for publication) (interpreting *Barrios* as reaffirming prior holdings that a sequencing instruction "adequately instructs jurors to consider the defendant's requested instructions on lesser included offenses").

The sequenced instructions used in this case were not error; they ensured that a conviction was rendered only on proof beyond a reasonable doubt. Each lesser-included-offense instruction required such proof and instructed the jury to acquit Appellant if the proof did not meet that burden and to then continue to the next lesser-included offense. The absence of a benefit-of-the-doubt instruction like that in *Barrios* did not "*prevent* [the jury] from considering the greater and lesser offenses together, as

25

was sanctioned in *Barrios*," as Appellant asserts.[7]   After the offense instructions, the court instructed, "Unless you find from the evidence beyond a reasonable doubt, or if you have reasonable doubt thereof, you will acquit the defendant and say by your verdict 'Not Guilty.'"   And, as the court observed in *Barrios*, the trial court here read the entire charge to the jury before they began deliberating, allowing them to hear this instruction before considering Appellant's guilt.

Viewing the charge as a whole, the trial court did not err by declining to include the requested instruction.  *See Barrios*, 283 S.W.3d at 353 (holding there was no error where the charge allowed the jury to consider the entire charge as a whole and the complained-of instruction did not require the jury to unanimously agree that the

---

[7]Appellant did not request such an instruction.  Even if we found its absence to constitute error on its own, it would only be reversible if we found it resulted in egregious harm.  *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see* Tex. Code Crim. Proc. Ann. art. 36.19.  We do not find such egregious harm—it did not "affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive."  *See Taylor v. State*, 332 S.W.3d 483, 490 (Tex. Crim. App. 2001) (citing *Almanza*, 686 S.W.2d at 172).  As we have discussed above, the charge as a whole instructed the jury that Appellant was not to be convicted of a greater offense without proof beyond a reasonable doubt and the absence of such proof required a not guilty verdict.  Significant evidence of Appellant's guilt was provided at trial—his arrangement of his meeting with VanCleave through 5miles, his following her to her apartment, his struggle with her outside the apartment and shooting her with his gun, and then his abandoning her on the sidewalk to die and escaping with his family to Houston.  Thus, to the extent Appellant's argument can be construed to take issue with the instruction's absence, any error was harmless.

defendant was not guilty of the greater offense before considering a lesser-included offense). We overrule Appellant's fifth point.

## Conclusion

Having overruled Appellant's five points, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: September 3, 2020